UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUIS VUITTON MALLETIER S.A., <br><br> Plaintiff, <br><br> v. <br><br> LY USA, INC., MARCO LEATHER GOODS, LTD., COCO USA INC., CHONG LAM, and JOYCE CHAN, <br><br> Defendants. | 06 CV 13463 (AKH) |

## DECLARATION OF MICHAEL J. ALLAN IN SUPPORT OF PLAINTIFF'S APPLICATION FOR STATUTORY DAMAGES, ATTORNEYS' FEES, INVESTIGATIVE FEES AND EXPENSES

I, Michael J. Allan, do solemnly swear as follows:

1. I am an attorney with the law firm of Steptoe & Johnson LLP ("Steptoe"). My business address is 1330 Connecticut Avenue, N.W., Washington, DC, 20036. I am responsible for overseeing the work done by all attorneys and support staff in this case. I submit this declaration in support of Louis Vuitton's request for a maximum statutory damages award of $8 million along with recovery of its attorneys' fees and costs of $556,034.22, as outlined in the summary attached as Exhibit A and described in more detail herein.

2. This case originated when I was an attorney with Arnold & Porter. Arnold & Porter represented Burberry Limited in a case against Marco Leather Goods, Ltd. and Coco USA Inc. Within a few months of the conclusion of that matter, which

resulted in a judgment by consent, Arnold & Porter was contacted by Louis Vuitton concerning the initiation of this case. While at Arnold & Porter, I was the primary day-to-day lawyer on the file. When I joined Steptoe & Johnson in August 2007, Louis Vuitton asked me to continue my representation in this case.

### Background of the Litigation

3. The initial pretrial conference in this case was held on January 26, 2007. At that conference, Louis Vuitton presented the Court and defense counsel with portions of defendants' catalogs offering for sale several plainly counterfeit Louis Vuitton products. On reviewing the materials, the Court recommended that the parties consider settlement and ordered the parties to return two weeks later, on February 9. Between January 29 and February 9, I tried several times to initiate settlement negotiations with the Defendants to no avail. I was told by defense counsel that none of the merchandise shown in the catalog pages that I provided on January 26 had been sold in the United States.

4. After discovery commenced, we served written discovery designed to reveal inventory, sales and supplier data, as well as defendants' profits, for the merchandise Louis Vuitton identified as counterfeit and/or infringing. Even after entry of a finely negotiated protective order, Defendants failed to respond meaningfully to any written discovery. Finally, in late August 2007, the Defendants produced a total of 41 pages of paper, none of which addressed the core issue in discovery – the sale of counterfeit Louis Vuitton merchandise. Despite minor document supplementations, the defendants failed to produce any information concerning their sales and inventory of counterfeit merchandise.

5.      I tried numerous times during the early Fall of 2007 – months before Mr. Lam and Ms. Chan were arrested – to resolve these discovery disputes with Defendants without involving the Court. Specifically, I sent comprehensive letters detailing the deficiencies with the document productions and also tried to resolve these issues in telephone conferences with opposing counsel.

6.      The Defendants in this case failed to even produce the documents that were produced in an earlier litigation brought by Burberry Limited, in which I represented Burberry. For example, Marco and Coco produced hundreds or more pages of U.S. Customs documentation concerning the seizure of counterfeit merchandise, including counterfeit Louis Vuitton merchandise, in the litigation with Burberry. The Defendants here also failed to produce any of the hundreds of pages of catalogs, invoices, shipping documentation, bills of lading and related documents provided by Mr. Woo and produced in earlier litigation. When questioned about this, Defendants maintained that all responsive information had been produced.

7.      In Septmeber 2007, Louis Vuitton served six deposition notices on the Defendants and made it clear that motions to compel responsive documents and thorough interrogatory answers were imminent. Louis Vuitton then suggested that the parties consider mediation before litigation costs began to escalate. Defendants agreed. I made it clear to all defense counsel that additional sales and inventory information had to be produced before the mediation or Louis Vuitton would proceed with the depositions and motions practice. Defense counsel agreed, as set forth in the correspondence attached as Exhibit B.

8.      On October 25, 2007, the Court issued an Order staying discovery for 60 days. (Doc. No. 25). Louis Vuitton then began to prepare for the upcoming November 20, 2008 mediation. In so doing, we requested the complete inventory, sales and financial information that Defendants promised they would produce in advance. Coco produced invoices related to the sale of its "M9" collection – but none of the Defendants produced any of the counterfeiting sales and inventory information as was required. Louis Vuitton prepared a detailed mediation statement proving the size and scope of Defendants' counterfeiting scheme and the relatedness of the Defendants. All of Louis Vuitton's evidence was discovered from third parties or its own investigative efforts; nothing used at mediation was produced by Defendants. The Defendants did not mediate in good faith. Rather, they issued baseless denials in the face of irrefutable evidence and made a far less than "nuisance value" settlement offer. Despite Louis Vuitton's and Judge Maas' best efforts, the mediation was not successful.

9.      Following expiration of the stay, the parties appeared at a January 3, 2008 status conference at which Louis Vuitton asked for an order compelling documents including supplier, inventory and sales information for all of the Defendants' counterfeit and infringing goods. Defense counsel represented that all documents responsive to Louis Vuitton's requests had been produced. The Court instructed Louis Vuitton to depose the defendants and cautioned defense counsel that sanctions would be levied if the depositions revealed that documents had been withheld.

10.     When Louis Vuitton attempted to depose the Defendants, as the Court instructed, the Defendants dilatory tactics continued – including eleventh hour cancellations and outright refusals to appeal. Louis Vuitton was forced into motions

practice just to depose party witnesses. After the Court granted Louis Vuitton's motion to compel the depositions of Ms. Chan and Mr. Lam, they asserted their Fifth Amendment privilege to nearly every question at deposition. The corporate defendants simply refused to appear for deposition. Louis Vuitton worked diligently to resolve these discovery disputes without involving the Court.

11. Despite the Defendants' failure to comply with their discovery obligations, Louis Vuitton supplemented its written discovery more than doubling the size of its document production. Louis Vuitton also produced several witnesses for deposition.

12. Prior to filing its motion for summary judgment, Louis Vuitton attempted to settle one last time. Congnizant of Defendants' concerns about the criminal case against Ms. Chan and Mr. Lam, Louis Vuitton negotiated the terms of a proposed settlement with these concerns at the forefront. Indeed, after several settlement meetings, the parties had reached a memorandum of understanding, which was reduced to writing, on nearly all material terms. Then, without warning, the Defendants refused to settle claiming that a settlement here might be used against them in the criminal case. That concern was alleviated when the criminal prosecutor advised that a settlement here would not be used in the criminal case. Despite resolution of that one and only impediment to settlement, the Defendants refused to settle. Louis Vuitton invested significant time and resources to try and resolve this matter before judgment.

13. As a result of the Defendants' obstructionist and dilatory discovery tactics, Louis Vuitton was forced to spend far more in fees and expenses to successfully prosecute this case than would otherwise have been necessary.

## Timekeepers, Legal Fees and Expenses Incurred in the Litigation

14. I am also submitting this declaration to provide the qualifications of the timekeepers who devoted legal services to the successful prosecution of this trademark counterfeiting and infringement case and to document the time and rates that make up the request for attorneys' fees and expenses requested by this Court in its Order dated August 25, 2008 (Docket No. 109). As set forth in Exhibit A, and described more fully below, Louis Vuitton incurred $497,146.49 in fees and $58,887.73 in costs and expenses during its successful prosecution of this case.

### Educational Background and Professional Experience of Steptoe & Johnson Attorneys Working on this Case

#### Michael J. Allan

15. I received my J.D. *cum laude* in 1998 from the Syracuse University College of Law where I was a member of the *Syracuse Law Review* and the *Syracuse Moot Court Board*. I received my B.A. from Hamilton College in 1995. I am an active member of the bars of New York and the District of Columbia and an inactive member of the bar of South Carolina. I am also admitted to several District Courts including the District Court for the District of Columbia, the Nothern District of New York and this Court.

16. I have practiced law at Steptoe since August 2007. Before that I was associated with the law firm of Arnold & Porter, LLP.

17. I am a member of the Intellectual Property Group and the Litigation Department at Steptoe. My practice focuses on intellectual property litigation. I have particular expertise in the areas of trademark infringement and counterfeiting and

have represented clients in numerous such matters over the last several years. I also have experience litigating proceedings before the United States Patent and Trademark Office ("PTO") involving oppositions to pending applications to register trademarks. In addition to my experience litigating intellectual property cases, I have litigated numerous commercial litigation matters.

18. The overwhelming majority of my personal work and Steptoe's work as a firm is charged to clients on a non-contingent hourly rate basis. In many of these matters I have been both the lead attorney in providing services to the client and the attorney responsible for billing. I have reviewed numerous invoices and submitted them to clients, and I have dealt with any client questions that arose about those billings.

### William Pecau

19. William Pecau received his J.D. from Vanderbilt University Law School in 1976, where he was Associate Editor of the *Vanderbilt Journal of Transactional Law*. In 1973 he received his B.A. from the University of the South *cum laude*, Phi Beta Kappa. Mr. Pecau is admitted to practice in the District of Columbia, New York, and California. He is admitted to numerous Courts, including the United States Supreme Court, the Courts of Appeals for the Second, Fourth, Ninth, and Federal Circuits. He is also admitted to several United States District Courts, including this Court.

20. Mr. Pecau is a partner in the Intellectual Property group in Steptoe & Johnson's Washington, D.C. office. He litigates diverse trademark, false advertising, copyright, and patent cases on behalf of plaintiffs and defendants. As lead trial counsel,

Mr. Pecau has represented clients before many federal trial and appellate courts in the United States and proceedings before the PTO.

21. Before joining Steptoe, Mr. Pecau was a partner at Pennie & Edmonds, one of the largest intellectual property law firms in the United States, representing clients in several noteworthy cases as first chair.

### Rachel M. Hofstatter

22. Rachel M. Hofstatter received her J.D., with highest honors, in 2004 from The George Washington University School of Law, where she was Senior Notes Editor for *The George Washington Law Review*, Order of the Coif, and Merit Scholar. In 2001 she received her B.A., with honors and with highest distinction, Phi Beta Kappa from the Pennsylvania State University. She is admitted to practice before the bars of District of Columbia, Maryland, and the District Court for the District of Columbia.

23. Ms. Hofstatter is an associate in the Washington office of Steptoe & Johnson LLP, where she is a member of the Intellectual Property group and Litigation Department. Ms. Hofstatter's practice focuses primarily on the acquisition, protection and enforcement of intellectual property rights. She has represented clients from various industries in intellectual property litigation in federal court and at the PTO Her litigation experience includes the prosecution and defense of trademark, trade dress, copyright and patent infringements, unfair competition, domain name, trademark oppositions, and false advertising claims.

### Lenor C. Marquis Segal

24.  Lenor Marquis Segal received her J.D. in 2002 from the New York University School of Law. She received her B.S. from Cornell University in 1998. She is an associate in the firm's New York office. She is a member in good standing of the bars of California and New York. Ms. Marquis has experience in both intellectual property and commercial litigation, including on matters involving trademark infringement and trademark counterfeiting.

### Lindsey B. Lang

25.  Lindsey B. Lang received her J.D. *cum laude* from the Washington College of Law in 1982, where she was an editor of the American University Law Review. She received a Bachelor of Arts degree in Government from Smith College in 1973. In 1976 Ms. Lang received a masters degree in International Relations from the George Washington University School of Public and International Affairs. Ms. Lang has been admitted to the bars of the State of Maryland and the District of Columbia.

26.  Since joining Steptoe in 1982, Ms. Lang has worked extensively in the firm's litigation group, litigating large antitrust matters as well as representing clients before grand juries. Since 1999, she has been the associate coordinator of the firm's attorney's fees practice. Ms. Lang has assisted numerous individuals and public interest law groups in securing attorney's fees under the civil rights statutes. Ms. Lang has served as fee counsel to the plaintiffs in several large class actions where substantial attorneys' fees have been awarded, including *Hartman v. Rice*, Civil Action No. 77-2019 (JR) (D.D.C.); *Cohen v. Brown University*, C.A. No. 92-197 (D. R.I.); and *Communities for Equity v. MHSAA*, C.A. No. 1:98-CV-479 (W.D. Mich.).

27. As the lead attorney, I was the most active timekeeper in the represenation of Louis Vuitton in this trademark infringement case. I was assisted by several additional Steptoe timekeepers, but the most integrally involved were associates Rachel Hofstatter, Lenor Marquis Segal, and two paralegals -- Yana Breding and Kimberlyn Brzozowski. William Pecau assisted from time to time and Ms. Lang assisted with the fee application. I staffed this case leanly, utilizing firm resources only where necessary and efficient.

### Educational Background and Professional Experience of Arnold & Porter Attorneys Working on this Case

#### Roberta Horton

28. Roberta Horton received her J.D. and undergraduate degrees from Yale University in 1986 and 1983, respectively. She is admitted to the District of Columbia and Illinois bars. Ms. Horton practices in the area of trademark and copyright law and is head of Arnold & Porter's Washington, D.C. trademark practice. She has handled numerous matters in both District Court cases as well as proceedings before the PTO on behalf of trademark owners. Ms. Horton was involved in the case Burberry Limited filed against Marco Leather Goods, Ltd. and Coco USA Inc.

#### Anthony Boccanfuso

29. Tony Boccanfuso is the litigation manager in Arnold & Porter LLP's New York office. Mr. Boccanfuso received his J.D. from New York Law School in 1989 and his BS from Old Dominion University in 1985. He is admitted to practice in New York, each of the District Courts in New York as well as the Eleventh Circuit, United States Tax Court, and the United States Supreme Court.

30. He has significant experience in the New York State and Federal Courts, with an emphasis on procedural issues (particularly in complex commercial matters) and New York substantive law. Moreover, Mr. Boccanfuso has represented numerous Arnold & Porter clients in trademark infringement and counterfeiting matters in New York. Mr. Boccanfuso was involved in the case Burberry Limited filed against Marco Leather Goods, Ltd. and Coco USA Inc.

### Brent Labarge

31. Brent Labarge received his J.D. in 2006 from Washington University and his undergraduate degree in 2001 from Cornell University. He is admitted to the New York bar. Mr. Labarge is a member of the Intellectual Property Group at Arnold & Porter and focuses his efforts on trademark and copyright litigation.

32. I was the most active timekeeper in the represenation of Louis Vuitton while this case was at Arnold & Porter. I was assisted by several additional Arnold & Porter timekeepers, but the most integrally involved were Roberta Horton, Anthony Boccanfuso, Brent Labarge and paralegal Michael Sandifer.

33. The qualifications of the timekeepers described above are evidence of the expertise of the individuals who participated in the successful prosecution of this case. Both Arnold & Porter and Steptoe & Johnson have the breadth and depth in the substantive intellectual property law and the litigation expertise to handle this complex matter.

## Billing Practices and Hours Reasonably Worked by Steptoe & Johnson LLP Attorneys on this Matter

34. Steptoe requires that all attorneys and other timekeepers contemporaneously record the time they spend on each client matter and have that time entered into our computerized billing system, where it is stored until requested for billing purposes.

35. Generally, client matters are billed on a monthly basis, although some matters are billed at other intervals or on completion. In the typical case, each month our accounting staff prints from our computer system unedited billing summaries for each matter that include all the time for timekeepers and expenses charged to that matter. Using these computer-generated summaries, the billing attorney reviews the time spent, the services performed and the expenses incurred on the matter, and edits the bill, including the process of deleting charges for time or expenses which in the billing attorney's judgment should not be billed. The billing attorney, with the assistance of others working on the matter, may make additional edits to supplement or clarify the time descriptions, correct spelling or grammatical errors, or eliminate time and expenses that were attributed to the case erroneously. Invoices are then prepared and sent to the client.

36. In this case, Steptoe's time was recorded in accordance with the firm's normal practices described above and the time reflected in the time descriptions was reviewed in the same manner as customarily followed.

37. A summary of the hours and lodestar of Steptoe & Johnson timekeepers is attached as Exhibit C.

38. The time descriptions of Steptoe & Johnson individuals involved in this matter are included in the invoices, which are attached as Exhibit D.

39.    I have exercised billing judgment to eliminate time spent on work that was even arguably duplicative, excessive, unnecessary or lacking in sufficient detail. I have also eliminated entirely the time for individuals whose contribution to the case was de minimus in terms of hours. Even though this time was productive and contibuted value to the representation, over twenty percent of the time billed by Steptoe & Johnson timekeepers is not being sought in this petition. A summary of the number of hours that are not being sought due to this exercise of billing judgment is also found on Exhibit C.

### Steptoe & Johnson Rates

40.    Steptoe typically sets its rates at the beginning of each calendar year for each lawyer, summer associate, law clerk, legal assistant or library assistant. The non-contingent rates for each individual timekeeper are, *inter alia*, a function of his or her level of experience, the area of practice, and the client relationship, and are consistent with market rates charged by similarly experienced attorneys and other legal staff performing similar work. These rates are premised upon prompt payment and therefore do not include any compensation for delay.

41.    The overwhelming majority of Steptoe's clients are billed on an hourly rate basis with the hourly rates charged for each timekeeper adjusted annually, typically on January 1. Our hourly rates for partners in Washington, D.C. and New York for 2008 range from $520 to $895; for of counsel and special counsel from $450 to $845; for associates from $275 to $550; and for paralegals and other non-attorney professionals from $110 to $335. My hourly rate of $500 per hour was reduced to $440 an hour in an effort to reduce costs for Louis Vuitton.

42. Using Steptoe's customary rate for each timekeeper who contributed to the successful prosecution of this case, the lodestar would be $414,216.00 Eliminating the hours that have been withdrawn from the petition reduces the lodestar by $59,570.25.

### Billing of Arnold & Porter Time

43. Arnold & Porter has similar time recordation practices and the bills in this matter were prepared in a manner consistent with the practices described above for the preparation of the Steptoe & Johnson bills.

44. Arnold & Porter has similar rate setting procedures and sets associate and partner rates consistent with its view of the Washington, D.C. legal market. The bills in this matter reflect the historic billing rates that were in effect at the time that work was done and the bills prepared. For this petition, the rates for the Arnold & Porter individuals who contributed legal services in this case have been updated to reflect an approximation of what their current rates would be in the D.C. market for individuals with the qualifications and expertise exemplefied by by the Arnold & Porter timekeepers in this case. This updating has been accomplished by taking the 2007 rate actually charged to and paid by Louis Vuitton for the individual and increasing it by the same adjustment factor used by the Department of Labor in computing the increase in legal services as part of the nationwide Consumer Price Index.

45. A summary of the hours and lodestar of Arnold & Porter timekeepers is attached as Exhibit E.

46. The time descriptions of Arnold & Porter individuals involved in this matter are attached as Exhibit F. Any time entries involving work for Louis Vuitton

on other matters, even if some time was spent on this matter, were redacted and are not made part of the fee request here.

47.  As with the Steptoe invoices, I have exercised billing judgment to eliminate time spent on work that was even arguably duplicative, excessive, unnecessary or lacking in sufficient detail. I have also eliminated entirely the time for individuals whose contribution to the case was de minimus in terms of hours. I have exercised billing judgment to eliminate the time for any timekeeper with fewer than 11 hours devoted to the case while it was at Arnold & Porter even though this time was productive and contibuted value to the representation. This reduces the Arnold & Porter time sought by over ten percent. A summary of the number of Arnold & Porter hours that are not being sought due to this exercise of billing judgment is included on Exhibit E to this Declaration.

## Expenses

48.  I have reviewed records reflecting the expenses incurred by both Steptoe & Johnson and Arnold & Porter in this case. Plaintiff seeks $58,887.73 in expenses, which I verify were necessary and reasonable and were incurred by the firms and posted to this case over the course of the litigation. A summary of the expenses sought is attached as Exhibit G. Exhibit G includes the investigative fees incurred by Allegiance Protective Services, which were paid directly by Louis Vuitton. The full record of each item charged is available upon request.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 8, 2008

_____
Michael J. Allan

# CERTIFICATE OF SERVICE

I hereby certify that I caused to be served upon the parties listed below by ECF and Federal Express on September 8, 2008, a true and correct copy of the annexed Declaration of Michael J. Allan in Support of Plaintiff's Application for Statutory Damages, Attorneys' Fees, Investigative Fees and Expenses.

Kimberlyn W. Brzozowski

Kathleen C. Waterman, Esq.
Law Office of Kathleen C. Waterman
419 Park Avenue South, Suite 407
New York, NY 10016
  *Attorney for LY USA, Inc.*

Angelo Rios, Esq.
Cheven, Keely & Hatzis
40 Wall Street
New York, NY 10005
  *Attorney for Coco and Chan*

Thomas Torto, Esq.
419 Park Avenue South
New York, NY 10016

Michael G. Down, Esq.
112 Madison Avenue, 3rd Floor
New York, NY 10016
  *Attorney for Marco Leather Goods, Ltd.
  and Chong Lam*